# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| TARA D. LODGE, Individually and on Behalf of All Others Similarly Situated, | : |
| Plaintiff, | : |
| v. | : C.A. No. 19-866-LPS |
| STERLING JEWELERS, INC. and COMENITY BANK, | : |
| Defendants. | : |

Chad J. Toms, Kaan Ekiner, WHITEFORD TAYLOR & PRESTON LLC, Wilmington, DE

Gretchen Freeman Cappio, Derek W. Loeser, Gabriel E. Verdugo, Benjamin B. Gould, KELLER ROHRBACK L.L.P., Seattle, WA

Alison E. Chase, Matthew J. Preusch, KELLER ROHRBACK L.L.P., Santa Barbara, CA

 Attorneys for Plaintiff

Rebecca L. Butcher, LANDIS RATH & COBB LLP, Wilmington, DE

Valerie L. Hletko, KAPLAN HECKER & FINK LLP, New York, NY

Walter E. Zalenski, BUCKLEY LLP, Washington, DC

Scott T. Sakiyama, BUCKLEY LLP, Chicago, IL

 Attorneys for Defendant Sterling Jewelers, Inc.

James D. Taylor, Jr., SAUL EWING ARNSTEIN & LEHR LLP, Wilmington, DE

Ryan L. DiClemente, Colleen Fox, SAUL EWING ARNSTEIN & LEHR LLP, Princeton, NJ

 Attorneys for Defendant Comenity Bank

## **OPINION**

February 19, 2021
Wilmington, Delaware

[signature]

**STARK, U.S. District Judge:**

## I. INTRODUCTION

In this putative consumer class action, Plaintiff Tara D. Lodge ("Plaintiff" or "Lodge") alleges that Defendants Sterling Jewelers, Inc. ("Sterling") and Comenity Bank ("Comenity" and, collectively with Sterling, "Defendants") opened a credit card in her name without authorization, and that they did the same to similarly-situated consumers. (D.I. 29)[1] Defendants deny the allegation, deny that a class can be certified under Federal Rule of Civil Procedure 23, and assert that Lodge's claims are subject to arbitration pursuant to an arbitration clause in the alleged credit card agreement. (*See* D.I. 49, 53; *see also* D.I. 97 at 3)

Following limited discovery, as agreed to among the parties (*see* D.I. 41), the Court heard oral argument on Defendants' motions to compel arbitration and to stay the proceedings (*see* D.I. 88; D.I. 89 at 54-65). Acting pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, and applying a summary judgment standard,[2] the Court held that genuine disputes of material fact at that stage precluded a determination that the parties had entered into an

---

[1] The instant action was filed on May 8, 2019, with Lodge and Jacqueline Desmond as named plaintiffs. (D.I. 1) Desmond was later voluntarily dismissed from the case, leaving Lodge as the sole named plaintiff. (D.I. 28) Count I of Lodge's amended complaint alleges violations of the Ohio Consumer Sales Practices Act (Ohio Rev. Code § 1345.01, *et seq.*) by Defendant Sterling. (D.I. 29 ¶¶ 78-86) Count II alleges violations of the Fair Credit Reporting Act (15 U.S.C. § 1681, *et seq.*) by Defendant Comenity. (D.I. 29 ¶¶ 87-94) Count III alleges violations of the Delaware Consumer Fraud Act (*see* Del. Code Ann. tit. 6, § 2513) by Comenity. (D.I. 29 ¶¶ 95-99) Count IV alleges unauthorized issuance of credit cards in violation of the Truth in Lending Act and Regulation Z (*see* 15 U.S.C. § 1642; 12 C.F.R. § 1026.12(a)(1)) by both Defendants. (D.I. 29 ¶¶ 100-05) Count V seeks declaratory relief (*see* 28 U.S.C. § 2201) concerning Defendants' alleged conduct. (D.I. 29 ¶¶ 106-11)

[2] *See Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 771-76 (3d Cir. 2013) (holding that Rule 56(a) standard applies to motion to compel arbitration when opposing party contends that no contract exists).

1

agreement to arbitrate. (*See* D.I. 88; D.I. 89 at 54-65)[3] After denying Defendants' motions, the Court held a two-day remote summary bench trial on the narrow issue of whether a contract exists between the parties. (*See* D.I. 111, 112) ("Tr.")[4]

At trial, the Court heard testimony from multiple witnesses, including Lodge, and received documentary evidence. The parties then submitted post-trial briefing and proposed findings of fact. (*See* D.I. 108-10, 113-16)

For the reasons set out below,[5] the Court finds that the parties formed a contract containing an arbitration provision. Consequently, the Court will grant Defendants' request to compel arbitration of Lodge's claims.

## II.   RELEVANT FACTS[6]

Kay Jewelers is a Sterling branded store. (UF ¶ 2) There is a stand-alone Kay Jewelers

---

[3] While it is well-established that the FAA reflects a strong federal policy in favor of resolving disputes through arbitration, *see Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 263 (3d Cir. 2003), "this presumption in favor of arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties," *Kries v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (internal quotation marks omitted).

[4] Further detail on the procedural history of this case can be found in numerous other filings. (*See generally* D.I. 1, 28, 29, 42, 49, 53, 88, 89, 95, 99) While the Court's June 16, 2020 oral order denied Defendants' motions (*see* D.I. 88), it was understood among the parties and the Court (and clear from the pretrial order) that Defendants' request to compel arbitration remains pending before the Court and was the subject of the trial.

[5] The parties do not request a "detailed opinion." (D.I. 97 at 21; *see also* Tr. 336) Therefore, the Court's Opinion is targeted to those issues necessary to resolving the pending dispute.

[6] Certain findings of fact may also be provided in connection with the Court's legal analysis later in this Opinion. Citations are to the parties' Joint Additional Undisputed Facts (*see* D.I. 108) ("UF"), Defendants' Combined Statement of Disputed Facts (D.I. 109) ("DF"), and Plaintiff's Proposed Findings of Fact (D.I. 114) ("PF"), each of which further cites testimonial and documentary evidence in the record. The Court adopts the parties' joint statement of undisputed facts (D.I. 108) in full, even though not all of those findings are expressly recited in this Opinion.

2

store in Lorain, Ohio ("the Lorain Kay store"). (*See* UF ¶ 3) Heather Bouchonville has been the manager of the Lorain Kay store since August 2018 and has worked at Sterling jewelry stores for over ten years. (UF ¶¶ 7-8) (citing Bouchonville Tr. 78, 84)[7] As part of her job duties, Bouchonville regularly assists customers with applying for Kay Jewelers "Long Live Love" credit card accounts. (UF ¶ 9) (citing Bouchonville Tr. 79)

In January 2019, applying in-store for a Kay Jewelers credit card consisted of two steps: prequalification, and then submission of a credit card application. (UF ¶ 30) (citing Glasper Tr. 48-49) Sterling uses mobile tablets to process in-store applications. (UF ¶ 30) (citing PTX-1) A customer's Social Security number ("SSN") is required to advance past the first step of the tablet's prequalification application process flow. (Glasper Tr. 37-38) Comenity cannot process an application, or issue a credit card, without an SSN. (Glasper Tr. 38-40; Zarlengo Dep. Tr. 40)[8] A customer agrees to prequalification by selecting the "I AGREE" button on the in-store tablet. (Glasper Tr. 53; Sullivan Tr. 156) The in-store tablet application process flow states: "JEWERLY CONSULTANT: Please present the tablet to the customer to verify their personal information, read the prequalification Terms & Conditions, and consent to submit the prequalification by selecting 'I AGREE'." (PTX-1 at COMENITY000026; *see also* Glasper Tr. 51-52) A credit card account number cannot be generated until a credit application is completed and approved by Comenity. (UF ¶ 32) (citing Zarlengo Dep. Tr. 40-41, 60)

On January 18, 2019, Lodge visited the Lorain Kay store, as she did every six months to have her jewelry cleaned and inspected consistent with her warranty. (UF ¶ 11; *see also* Lodge

---

[7] Citations to witness testimony in the trial transcript are in the form: "([Witness last name] Tr. [page])."

[8] All deposition testimony cited in this Opinion was made part of the trial record. (*See* Tr. at 160-61; *see also* D.I. 97 at 7-8)

3

Tr. 173-74) Bouchonville was working in the Lorain Kay store that day (UF ¶ 10) (citing Bouchonville Tr. 85), and she was the first employee with whom Lodge interacted (*see* Lodge Tr. 175-77). Bouchonville does not remember the interaction with Lodge. (UF ¶ 27) (citing Bouchonville Tr. 87) Lodge is the only witness who testified at trial having personal knowledge of what occurred in the Lorain Kay store on January 18, 2019. (*See generally* Glasper Tr. 45-46; Bouchonville Tr. 78-79; Sullivan Tr. 124; Zarlengo Dep. Tr. 35, 50-52)

According to Lodge, she told Bouchonville that she was there to have her jewelry inspected and handed Bouchonville her jewelry; Bouchonville went to an iPad and then Lodge told Bouchonville her first and last name. (Lodge Tr. 176) Lodge testified that Bouchonville then went to a computer and told her, "It will be just a moment while I update your information." (*Id.* at 177) Lodge says that Bouchonville then placed a brochure ("the Brochure") on the counter and told Lodge, "Here, this is for you." (*Id.* at 178)

The Brochure (PTX-2; DTX-7 Ex. A) is a trifold document, comprising approximately 14 pages, the outside of which features a glossy photograph of a bride and groom along with the words, "Get prequalified for the LONG LIVE LOVE Credit Card today. SPECIAL FINANCING AVAILABLE." (PTX-2 at LODGE_00000031 (footnote omitted); *see also* Lodge Tr. 196-97) When the Brochure was handed to Lodge, she saw that Bouchonville had written Lodge's name, a dollar figure ($7,000), and a 16-digit number ending with 9685 on one of the inner pages. (Lodge Tr. 178, 197; *see also* PTX-2 at LODGE_00000034) The text at the top of the page on which Bouchonville's handwriting appears states in part: "<u>Prequalification Terms and Conditions:</u> I agree to be prequalified for credit by Comenity Bank ('Bank') for a Long Live Love Credit Card. I have read and agree to the disclosures provided on or with this prequalification." (PTX-2 at LODGE_00000034)

4

After leaving the store, Lodge placed the Brochure in the glove compartment box of her husband's vehicle and said to her husband, "Don't let me forget about it." (UF ¶ 16) (citing Lodge Tr. 181) At some point after January 18, 2019, Lodge removed the Brochure from the glove compartment and placed it in a drawer in her kitchen. (UF ¶ 17) (citing Lodge Tr. 193)

Comenity records show that the bank received and processed a credit card application submitted through a mobile tablet at the Lorain Kay store in Lodge's name, and that it was submitted by Bouchonville at 1:32 p.m. on January 18, 2019. (UF ¶¶ 14-15, 18) (citing PTX-11 (Zarlengo Decl.) ¶ 8) The application contained Lodge's SSN. (Zarlengo Dep. Tr. 63; DTX-5)

Defendants have proven, by a preponderance of the evidence, that Lodge's SSN appears in the credit card application because Lodge provided her SSN to Bouchonville on January 18, 2019, when she visited the Lorain Kay store. The Court credits evidence proffered by Defendants that: (i) SSNs are not maintained in Clienteling, Sterling's customer experience management system (Glasper Tr. 34-36); (ii) it is not possible for in-store employees to access any system or database that contains a customer's SSN (*id.*); (iii) Sterling did not have Lodge's SSN prior to January 18, 2019 (Glasper Tr. 29-34, 40; DTX-3); (iv) there is no way for a store employee to obtain a customer's SSN other than from the customer herself (Bouchonville Tr. 81); and (v) Comenity had no information or accounts associated with Lodge prior to January 18, 2019 (Zarlengo Dep. Tr. 23). Despite Lodge's denial that she ever provided her SSN (*see, e.g.*, Lodge Tr. 182), the record shows that it is more likely than not that Lodge provided her SSN to Bouchonville on January 18, 2019.[9] There is no alternative explanation that is more likely – or

---

[9] There were multiple points during Lodge's examination when her credibility was called into question. (*See, e.g.*, Lodge Tr. 195, 200, 203 (establishing Lodge's faulty recollection of Post-It Note on Brochure); *id.* at 211-13 (speculating about allegedly unproduced credit card application containing her SSN); *id.* at 205-06 (conflicting testimony about fraud concerns and reasons for handling Brochure with care)) But the Court need not, and does not, make a finding

5

more persuasive – as to how Lodge's SSN ended up in the credit card application.[10]

The Brochure contains contractual terms (hereinafter, the "Terms") for the credit card account for which, the Court finds, Lodge applied. The Terms include a choice-of-law provision, which provides that "this agreement is governed by Delaware and applicable federal law." (PTX-2 at LODGE_00000043) (capitalization omitted)  The Terms also include an arbitration provision (the "Arbitration Agreement") that defines "claim" to mean "any claim, dispute or controversy between you and us that in any way arises from or relates to this Agreement, the Account, the issuance of any Card . . . [and] includes disputes arising from actions or omissions prior to the date any Card was issued to you." (*Id.* at LODGE_00000046) Under the Arbitration Agreement, the term "claim" is given "the broadest possible meaning" and includes claims based on, among other things, "tort, consumer rights, fraud and other intentional torts," along with alleged violations of statutes and regulations. (*Id.*) Under the Arbitration Agreement, any claim that goes to the "validity or enforceability" of the contract as a whole is explicitly assigned "for the arbitrator, not a court, to decide." (*Id.*)

The Arbitration Agreement further provided Plaintiff with the opportunity to opt out, stating: "[i]f you don't want this Arbitration Provision . . . to apply, you may reject it by mailing us a written rejection notice . . . within thirty (30) calendar days . . . ." (*Id.* at LODGE_00000045) Absent exercise of this opportunity to opt out, however, the Arbitration

---

as to whether Lodge lied at trial. It could very well be that she no longer accurately remembers every detail of her interaction with Bouchonville in January 2019 – although it must be noted that she expressly and repeatedly denied (including under questioning from the Court at trial) that she could have forgotten giving her SSN. (*See, e.g.*, Lodge Tr. 210-11, 216)

[10] The Court agrees with Defendants that "[t]he evidence in the record is clear that Comenity received Lodge's Social Security number from the application from Sterling, not from a credit bureau." (D.I. 116 at 3-4) (citing Zarlengo Dep. Tr. 63)

Agreement remains in force even following closure of the account. (*Id.* at LODGE_00000047)

On January 21, 2019, Lodge received a credit alert indicating that a credit card account had been opened in her name. (PTX-3; Lodge Tr. 187-88) Lodge then complained to Kay Jewelers' customer service via an online chat, explaining that a credit card had been created without her authorization. (UF ¶¶ 19-20) (citing PTX-7; PTX-8) Lodge also left a voicemail with a district sales manager for Sterling, claiming that she had received a Kay Jewelers credit card for which she had not applied, that she had not given her SSN, and that she did not know how she got the credit card. (UF ¶ 23) (citing Sullivan Tr. 109) Comenity closed Lodge's Kay Jewelers credit card account on January 23, 2019. (UF ¶ 21) (citing PTX-10)

## III.   APPLICABLE LAW

While the parties disagree on whether Delaware or Ohio law controls, they agree that there are no material differences between the two states' laws on the issues of contract formation that affect how their dispute should be resolved. (*See* D.I. 110 at 4-6 (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)); D.I. 113 at 22 (citing *Kostelnik v. Helper*, 770 N.E.2d 58 (Ohio 2002)) The parties agree that Defendants bear the burden to prove, by a preponderance of the evidence, the existence of an arbitration agreement.[11] (D.I. 110 at 4 (citing

---

[11] The parties' filings refer to the Court determining whether the parties have a "valid" arbitration agreement. (*See, e.g.*, D.I. 94 at 2; D.I. 97 at 3 (parties stating in pretrial order that bench trial to be held "on the single issue of arbitrability," adding that the "sole factual issue to be resolved by the Court at that trial is whether Defendants can show . . . that the Parties have a valid arbitration agreement"); D.I. 110 at 1 (Defendants stating issue for summary trial is whether "the parties have a valid arbitration agreement")) To be clear, the issue before the Court (which was the subject of the trial) is the threshold issue of contract *formation*: did Lodge and Sterling enter into *any* contract? The issue is not, if a contract exists, whether that contract is valid. This latter question – which will now arise, given the Court's finding in this Opinion that a contract was formed – is delegated to the arbitrator. (*See* D.I. 89 at 62-63; UF ¶ 4 (citing PTX-2 at LODGE_00000046); *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019))

7

*Greenwich Collieries v. Director, Off. of Workers' Comp. Programs*, 990 F.2d 730, 736 (3d Cir. 1993)); D.I. 113 at 22; D.I. 116 at 1) They further agree that the relevant issue is whether Lodge objectively manifested assent to form a contract. (*See* D.I. 110 at 5; D.I. 113 at 22; *see also Wells v. Merit Life Ins. Co.*, 671 F. Supp. 2d 570, 574 (D. Del. 2009) ("In Delaware, a contract exists if a reasonable person would conclude, based on the objective manifestations of assent and surrounding circumstances, that the parties intended to be bound by their agreement on all essential terms.") (internal quotation marks omitted); *Ford v. Tandy Transp., Inc.*, 620 N.E.2d 996, 1006 (Ohio Ct. App. 1993) ("[M]utual assent is normally manifested by offer and acceptance. An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it. The manifestation of assent by the offeree constitutes the acceptance.") (internal citation omitted))

## IV. DISCUSSION

Upon consideration of the entire trial record and the parties' post-trial submissions, the Court is persuaded that Defendants have shown, by a preponderance of the evidence, that Lodge objectively manifested assent to the Terms and that the parties intended to be bound by all essential terms, including the Arbitration Agreement. The Court agrees with Defendants that three factual findings – each non-dispositive individually, but all of which the Court credits in totality – lead to the conclusion that a contract was formed. (*See, e.g.*, D.I. 110 at 2-4; D.I. 116 at 1)

First, as already noted, the Court finds that Lodge provided her SSN (as well as other personal identification information) to Bouchonville on January 18, 2019. Although not dispositive (*see* D.I. 110 at 8), this finding provides strong support for the conclusion that Lodge objectively manifested a willingness to open a credit card account. Bouchonville testified that

8

"Ms. Lodge was just like every other guest that I welcome into the store" who is "offer[ed] . . . the opportunity to have a credit application." (Bouchonville Tr. 100-01) Lodge testified that she understands that an SSN must be provided to apply for credit (Lodge Tr. 209-10), adding that she has previously done so for other retail credit cards, including at Kohl's, JC Penney, and Cabela's (*id.* at 166). In the Court's view, then, Lodge's providing her SSN in response to Bouchonville's inquiry strongly supports a conclusion that Sterling offered to enter into a credit card agreement and that Lodge accepted that offer.

Second, it is undisputed that Lodge watched as Bouchonville handwrote Lodge's name, a 16-digit credit card account number, and a $7,000 credit limit directly on the Brochure containing the Terms, and that Bouchonville handed the Brochure to Ms. Lodge while stating, "Here, this is for you." (Lodge Tr. 178, 197; PTX-2 at LODGE_00000034) The Court disagrees with Lodge's contention that these facts do not "provide any indication [that the Brochure] was for a credit card opened in Ms. Lodge's name." (D.I. 113 at 28) To the contrary, given Lodge's prior experience and understanding of retail credit card accounts, as well as all surrounding circumstances relating to the January 18, 2019 interaction between Lodge and Bouchonville, the Court concludes that Lodge's acceptance of the Brochure – without any apparent questions and no outward expression of concern or disagreement – further objectively manifests a willingness to be bound by the Terms. Notably, the page to which the Brochure was opened when Bouchonville handed it to Lodge stated at the top: "I agree to be prequalified for credit by Comenity . . . for a Long Live Love Credit Card." (PTX-2 at LODGE_00000034) The cover of the Brochure also clearly indicates that the Terms concern a credit card. (*Id.* at LODGE_00000031) In light of these facts, the Court concludes that Lodge knew (and, objectively, should have known) that the Brochure related to a credit card in her name – not, as

9

Plaintiff contends (*see* D.I. 113 at 27-28), a credit card her husband may have previously opened.

Third, the facts that Lodge walked out of the Lorain Kay store with the Brochure; placed it in her husband's vehicle's glove compartment box and told him, "Don't let me forget about it" (UF ¶ 16) (citing Lodge Tr. 181); and later moved the Brochure into her kitchen drawer (UF ¶ 17) (citing Lodge Tr. 193) provide further support for the Court's conclusion. As Defendants persuasively argue, Lodge handled the Brochure with the "appropriate care" for a contract for a credit card – care well beyond what one would expect when dealing with advertising or marketing materials. (D.I. 110 at 9-10)

Lodge makes several arguments against the Court's conclusions. Ultimately, all are unavailing, especially given the Court's findings of fact.

Lodge attempts to rely on her purported subjective interpretations, particularly that she "just thought" that the Brochure was for "an account [her] husband had." (D.I. 113 at 28) (citing Lodge Tr. 178) To be sure, there is evidence in the record suggesting that Lodge did not intend to apply for a credit card and did not want one, including her nearly-instantaneous complaints to Defendants (*see, e.g.*, Lodge Tr. 193; PTX-10) and statements she made to her boss that "[s]omeone opened a credit card without my permission" (Terschak Tr. 221, 223). Still, "courts do not look for and give legal force to a private subjective state of mind (intent) but to objective acts (words, act and context) that constitute the enforceable contract." *Haft v. Haft*, 671 A.2d 413, 417 (Del. Ch. 1995); *see also Altercare of Mayfield Village, Inc. v. Berner*, 86 N.E.3d 649, 657 (Ohio Ct. App. 2017) ("[C]ourts will only consider objective manifestations of intent."). As explained above, Lodge's providing her SSN to Bouchonville, her acceptance of the Brochure (without apparent question or outward expression of concern), and her taking the Brochure out of the store all reflected – as they would to a reasonable person – that Lodge accepted Sterling's

10

contractual offer of a credit card. Whatever Lodge may have subjectively believed does not trump the impact of her actions, which objectively manifested assent. Nor can her subsequent actions unwind her objective manifestation of assent. *See, e.g., Trenton Metro. Area Local of Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 636 F.3d 45, 50 n.4 (3d Cir. 2011) ("The subsequent strategic behavior and subjective states of mind of the contracting parties do not change the import of the governing contracts."); *Snider v. Fort Wayne Police Dep't*, 2011 WL 4601051, at *2 (N.D. Ind. Sept. 30, 2011) ("[A] party who has previously authorized a [contract] remains bound by its terms even if he changes his mind.").

Lodge attempts to distract the Court from the conclusions it has reached by suggesting that Bouchonville engaged in fraudulent conduct by not strictly following all of Sterling's policies and procedures. (*See, e.g.*, D.I. 113 at 23-24) According to Plaintiff, Bouchonville admitted that she sometimes presses the "I AGREE" button on the tablet, rather than ensuring that only the customer presses the button. (*See id.*) (citing Bouchonville Tr. 89) Lodge's speculations are unpersuasive. The Court finds no credible basis in the record to conclude that Bouchonville submitted a credit card application for Lodge without Lodge having objectively manifested her assent for Bouchonville to do so. Bouchonville's testimony suggests that she would press the button on a customer's behalf only after providing the necessary disclosures to the customer and obtaining consent. (*See* Bouchonville Tr. 82, 87-89) Furthermore, the Court agrees with Defendants that "whether those policies and procedures were followed is irrelevant because the testimony and evidence show that there is no way that any departure from any policy or any procedure could have resulted in Defendants obtaining Lodge's Social Security number from any source other than Lodge." (D.I. 110 at 13-14)

Lodge's reliance on Defendants' January 2019 settlement with the Consumer Financial

11

Protection Board and the New York Attorney General also fails to help her case. The allegations in those proceedings (which Defendants have not admitted) involved fraudulently inducing customers to provide their SSNs and other personal information and then using that information to open credit card accounts that the customers did not want. (*See generally* PTX-13; PTX-14; PTX-15) Lodge's allegation here, however, is that Defendants never asked for her SSN and that she never gave it to them. While the Court has found that a preponderance of the evidence supports a finding that Lodge did give Bouchonville her SSN, the Court fails to see how disputed conduct in other proceedings – that is materially different from what is alleged by Plaintiff here – helps strengthen her case here. (*See* D.I. 110 at 20)[12]

Finally, Plaintiff has belatedly argued that arbitration should not be compelled because there was fraud in the execution. (*See, e.g.*, D.I. 113 at 36-40) If the Court finds (as it has) that Lodge provided her SSN, then according to Lodge, "even if this could be construed as the manifestation of assent to *something*, there still was no mutual assent to the *credit card agreement*, or the arbitration provisions included therein . . . because Defendants misrepresented the reason why Ms. Lodge was providing her personal information." (*Id.* at 36) (citing *MZM Constr. Co. v. N.J. Building Laborers Statewide Benefit Funds*, 974 F.3d 386, 403-04 (3d Cir. 2020)) The Court agrees with Defendants (*see* D.I. 116 at 9) that Lodge disclaimed this argument by her repeated insistence (through counsel and through her own testimony) that she did not provide her SSN to Bouchonville (*see, e.g.*, D.I. 89 at 27; *see also* Lodge Tr. 182, 210-11, 216; Tr. 298 (counsel reiterating that Lodge is "certain she did not" provide her SSN)). The

---

[12] Sterling's $11 million settlement with the CFPB and New York Attorney General was announced on January 16, 2019 (D.I. 29-1, Attach. B), just two days before Lodge visited the Lorain Kay store on January 18, 2019. According to a Sterling district sales manager with whom Lodge spoke after the credit card account was opened and closed, Lodge said, "I've seen Kay Jewelers in the news. I want part of the settlement." (Sullivan Tr. 109)

Court relied on Lodge's "unequivocal" denial (which is how her attorney previously characterized her testimony) in deciding to deny Defendants' motion to compel and to order a trial in which the Court could observe Lodge's testimony. (*See, e.g.,* D.I. 89 at 27, 55-56; *see also* D.I. 116 at 9 (Defendants arguing that "[t]he bedrock of Lodge's case has been her insistence that she did not provide her Social Security number, and the Court held a trial given its determination under the summary judgment standard that a reasonable person could believe her")) Lodge has, therefore, waived her fraud in the execution argument and is further judicially estopped from prevailing on it now. *See generally Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 221-22 (3d Cir. 2015) ("[J]udicial estoppel prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."). Moreover, as Defendants also correctly contend, Lodge's fraud in the execution theory would fail for additional reasons, including a lack of evidence and the likelihood that (under the circumstances here) it would be delegated to an arbitrator. (*See* D.I. 116 at 10) (citing *Audio Video Ctr., Inc. v. First Union Nat. Bank*, 84 F. Supp. 2d 624, 627 (E.D. Pa. 2000); *S. Jersey Sanitation Co v. Applied Underwriters Captive Risk Assurance Co.*, 840 F.3d 138, 143 (3d Cir. 2016))

The Court has considered Plaintiff's remaining arguments, but none of the others merits discussion. Defendants have met their burden.

## V. CONCLUSION

As Defendants have persuaded the Court that Lodge objectively manifested her assent to form a contract with Defendants pursuant to the Terms and intended to be bound by all essential terms, including the Arbitration Agreement, Defendants' request to compel arbitration will be granted. An appropriate Order follows.

13